UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES F. KRESS and
JULIE ANN KRESS,

               Plaintiffs,

     v.                                 Case No. 16-C-795

UNITED STATES OF AMERICA,

               Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs James and Julie Kress brought this tax refund action against the United States of America to recover an overpayment of gift taxes and interest related to Plaintiffs' gift of minority-interest stock in Green Bay Packaging, Inc. (GBP) to their children and grandchildren they claim were erroneously assessed and collected by the Internal Revenue Service for the 2007, 2008, and 2009 tax years. This court is asked to decide the fair market value of the minority-interest stock for these tax years. The court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1). A trial to the court was held on August 3 and 4, 2017. After the close of testimony and evidence, the parties submitted post-trial briefs. Having now considered the record, I make the following findings of fact and conclusions of law.

## BACKGROUND AND EVIDENCE

### I. Procedural History

Plaintiffs are shareholders in GBP, a family-owned subchapter S-corporation with its corporate headquarters in Green Bay, Wisconsin. Founded in 1933 by George Kress, GBP is a

vertically integrated manufacturer of corrugated packaging, folding cartons, coated labels, and related products. At the time this case was filed, GBP employed approximately 3,400 people in 14 states. Although GBP has the size and wherewithal to be a publicly-traded company, it has remained the closely held family company its founder envisioned. Approximately 90% of the company's shares of common stock are owned by the Kress family, and the remaining 10% are owned by GBP's employees and directors. Between 1990 and 2009, GBP paid annual dividends, ranging from $15.6 million to $74.5 million, to its shareholders each year.

The purchase price for shares sold by GBP to its employees and directors is 120% of the book value of each share. While there is an established price for the sale and purchase of GBP shares by employees and directors, there is no price established for shares that are transferred to members of the Kress family. Certain restrictions limit the ability to sell both family shares and non-family shares of GBP stock. The right-of-first-refusal restriction contained in the GBP Bylaws requires that an employee or director shareholder give GBP written notice of his intent to sell and offer to sell the shares to GBP before selling to others.

The Bylaws also contain a Family Transfer Restriction that limits how members of the Kress family may transfer their shares:

> Transfer of shares of the Corporation by shareholders who are members of the Kress Family . . . is hereby restricted to transfers by gift, bequest or private sale to a member or members of the Kress family, provided, however, that the children of George and Marguerite Kress may transfer shares of the Corporation by gift to such child's spouse or trust therefor and further provided that in the event of any such transfer as above provided to issue and descendants or spouse of a child or trust therefor of George and Marguerite Kress, that all of the restrictions set forth herein shall continue to be applicable to the shares of common stock then held by such issue and descendants or spouse or trust therefor as transferee.

Trial Ex. 26 at 10–11.  In short, the Restriction requires that the Kress family only gift, bequest, or sell their shares to other members of the Kress family.  Plaintiffs maintain that the Kress Family Transfer Restriction ensures that the Kress family retains control of GBP, minimizes the risk of disruption to GBP's affairs by a dissident shareholder, ensures confidentiality of GBP's affairs, and ensures that all sales of GBP minority stock are to qualified subchapter S shareholders.  As part of their estate planning, most of the senior members of the Kress family, including Plaintiffs, have annually gifted equal amounts of GBP stock to the younger members of their families.  From 1997 to the present, no junior member of the Kress family has gifted GBP shares to a more senior family member and no member of the Kress family has gifted shares of stock to another member of the family at the same generational level.

Plaintiffs gifted minority shares of GBP stock to their children and grandchildren in 2006, 2007, and 2008.  Plaintiffs each filed gift tax returns for tax years 2007, 2008, and 2009 to report the gifts and identified on their respective returns the fair market value for the gifted shares: $28.00 for tax year 2007, $25.90 for tax year 2008, and $21.60 for tax year 2009.  Plaintiffs each paid $1,219,241 in gift taxes with respect to the gifted shares, for a combined total of $2,438,482.

The IRS challenged the amounts Plaintiffs reported on their gift tax returns by letter dated November 30, 2010.  On August 19, 2014, the IRS sent Plaintiffs separate Statutory Notices of Deficiency for the tax years at issue.  After examining the returns, the IRS assessed deficiencies, finding that the fair market value of Plaintiffs' stock equaled the price used for actual share transactions between GBP and its employees which was $45.97 on December 31, 2006; $47.63 on December 31, 2007; and $50.85 on December 31, 2008.  Plaintiffs paid the gift tax deficiencies and accrued interest, totaling $2,218,465.80, in December 2014 in the amounts show below:

|  | James 2007 | Julie 2007 | Combined 2007 |
|---|---|---|---|
| Paid | $274,941.00 | $274,941.00 | $549,882.00 |
| Interest | $75,416.54 | $75,416.54 | $150,833.08 |
| **Total** | **$350,357.54** | **$350,357.54** | **$700,715.08** |

|  | James 2008 | Julie 2008 | Combined 2008 |
|---|---|---|---|
| Paid | $271,353.00 | $271,353.00 | $542,706.00 |
| Interest | $56,229.65 | $56,229.65 | $112,459.30 |
| **Total** | **$327,582.65** | **$327,582.65** | **$655,165.30** |

|  | James 2009 | Julie 2009 | Combined 2009 |
|---|---|---|---|
| Paid | $371,841.00 | $371,840.00 | $743,681.00 |
| Interest | $59,452.29 | $59,452.13 | $118,904.42 |
| **Total** | **$431,293.29** | **$431,292.13** | **$862,585.42** |

|  | James Total | Julie Total | Combined Total |
|---|---|---|---|
| Paid | $918,135.00 | $918,134.00 | $1,836,269.00 |
| Interest | $191,098.48 | $191,098.32 | $382,196.80 |
| **Total** | **$1,109,233.48** | **$1,109,232.32** | **$2,218,465.80** |

Plaintiffs then filed amended gift tax returns for tax years 2007, 2008, and 2009 seeking a refund for the additional federal taxes and interest they paid. After six months elapsed without receiving a response from the IRS regarding Plaintiffs' request, Plaintiffs initiated this lawsuit on June 24, 2016, to recover the gift tax and interest they were assessed.

## II. Green Bay Packaging

GBP is an established company with a strong balance sheet and has little debt compared to its equity as of the valuation dates. From 2002 to 2008, GBP's net sales increased. GBP's net

income increased overall from 2005 to 2008. In 2007, its net income decreased by more than $28 million but rebounded in 2008 by more than $33 million. The drop in GBP's net income was caused primarily by the extraordinary costs incurred for maintaining GBP's Arkansas Mill. Recognizing the value of the S-corporation structure, GBP did not seriously consider terminating its S-corporation election as of the valuation dates. In a May 2007 presentation, GBP management reported to their shareholders that they expected to save a total of $238.4 million in taxes between 1988 and 2006 by virtue of the classification as an S-corporation.

GBP has three non-operating assets: Hanging Valley Investments LLC, group life insurance policies, and two GBP private airplanes. Hanging Valley Investments LLC is a wholly-owned subsidiary of GBP that was created in 2005 to manage GBP's long-term investments. During the relevant time period, Hanging Valley had investments in mezzanine financing obligations, private equity funds, real estate investment funds, gas, oil, and other commodities. Hanging Valley contributes to GBP through appreciation of its investments, which GBP uses for operations and to pay dividends. During the years in question, Hanging Valley's assets were $65,002,000.00 on December 31, 2006; $71,451,000.00 on December 31, 2007; and $77,312,000.00 on December 31, 2008. GBP identified Hanging Valley as a non-operating asset and its cash flow projections listed Hanging Valley as a non-operating item.

GBP also has group life insurance policies on key employees and shareholders with substantial cash values. The policies are intended to provide reserve for specified events that will occur in the future, such as to assist with estate tax issues when a major shareholder passes away. The only corporate liabilities associated with the cash value of GBP's life insurance policies are a deferred compensation plan for selected employees and a non-qualified retirement pension program

5

for certain executives. The cash surrender value of GBP's life insurance policies for the relevant years was $142,240,000.00 on December 31, 2006; $151,672,000.00 on December 31, 2007; and $158,259,000.00 on December 31, 2008. The cash surrender value of the policies, less the associated corporate liabilities of deferred compensation and non-qualified pension obligations was $86,025,000.00 on December 31, 2006; $104,243,000.00 on December 31, 2007; and $111,434,000.00 on December 31, 2008. GBP identified the cash value of the life insurance as a non-operating asset.

Finally, GBP owned two private aircraft in 2007, 2008, and 2009. On average, the planes were used half of the time for business purposes and the other half for the Kress family's personal purposes. GBP's cash flow projections identified a portion of GBP's aircrafts as non-operating items.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Preliminary Matters

Before turning to the principal issues presented, the court will address certain preliminary matters. At trial, the Government objected to the admission of Plaintiffs' proposed exhibits 2, 3, 4, and 27 on relevancy grounds. Exhibits 2 through 4 are letters from the IRS to Plaintiffs conveying the IRS' determination that the stock was undervalued on Plaintiffs' original gift tax return and Exhibit 27 is an internal IRS memorandum analyzing Plaintiffs' position and explaining the agency's considerations and determinations regarding the issues presented in valuing GBP's stock. The Government argued that, because IRS administrative considerations and determinations are legally irrelevant to *de novo* proceedings, they are inadmissible under Federal Rules of Evidence 401, 402, and 403. The court took the Government's objection under advisement.

The court now sustains the objection regarding the admission of Exhibits 2, 3, 4, and 27 into evidence. Courts do not evaluate the procedure and evidence used in making a tax assessment but rather conduct a *de novo* review of the correctness of the assessment. *Ruth v. United States*, 823 F.3d 1091, 1094 (7th Cir. 1987); *see also R.E. Dietz Corp. v. United States*, 939 F.3d 1, 4 (2d Cir. 1991) ("The factual and legal analysis employed by the Commissioner is of no consequence to the district court."). The IRS administrative documents showing the agency's consideration of the issues presented in this case or the IRS' rationale for making its determinations has no bearing on the court's *de novo* determination of the fair market value of a minority-interest stock in GBP for the 2007, 2008, and 2009 tax years. Therefore, any evidence regarding the IRS' administrative considerations and determinations is irrelevant and will not be considered.

Plaintiffs have also filed a motion requesting that judicial notice be taken of the following facts related to the 2008 economic recession:

- On January 2, 2008, the Dow closed at 13,043.96, and on December 31, 2008, the Dow closed at 8,776.39, an almost 34% decrease.

- The Dow hit its pre-recession high on October 9, 2007, closing at 14,164.43. Less than 18 months later, it had dropped more than 50% to 6,594.44, on March 5, 2009.

- On September 15, 2008, Lehman Brothers declared bankruptcy. The Dow dropped 504.48 points that day.

- On September 16, 2008, the Fed announced it was making an $85 billion "loan" to AIG in return for 79.9 percent equity.

- On September 29, 2008, the Dow fell 777.68 points, the most in any single day in history.

- The U.S. economy lost 159,000 jobs in September 2008.

- The U.S. economy lost 240,000 jobs in October 2008, and the AIG bailout increased to $150 billion.

- In December 2007, the U.S. unemployment rate was 5.0%. Eighteen months later, in June 2009, the U.S. unemployment rate was 9.5%.

- Real GDP fell 4.3% from its peak in fourth quarter 2007 to its trough in second quarter 2009, the largest decline in the postwar era.

- The S&P 500 Index fell 57% from its October 2007 peak to its trough in March 2009.

- The net worth of U.S. households and nonprofit organizations fell from a peak of approximately $69 trillion in 2007 to a low of approximately $55 trillion in 2009.

Plaintiffs' Addendum to Joint Pre-Trial Report, ECF No. 22 at 2–3. Federal Rule of Evidence 201 allows courts to take judicial notice of adjudicative facts that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Government objects to Plaintiffs' request on the ground that many of the facts asserted are not relevant to the only issue in the case—the fair market value of the gifted shares of GBP stock on the three dates in question. The Government also objects because judicial notice of newspapers and website articles is improper for the truth of the matter asserted.

The financial condition of the country in general and the stock market in particular as of the valuation dates is clearly relevant to the question of what price a willing buyer would pay for and a willing seller would sell a share of GBP stock on January 1, 2009. The Revenue Ruling governing the issue lists "the economic outlook in general and the condition and outlook of the specific industry in particular" as the second factor that a reasonable buyer and seller would normally consider. Rev. Rul. 59-60, 1959-1 C.B. 237 (1959). And while newspaper and online articles are

not normally the kinds of evidence of which courts take judicial notice, a court may take judicial notice of a newspaper article if the movant demonstrates that "the facts of the article are either '(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' as required under Rule 201(b) of the Federal Rules of Evidence." *In re Am. Apparel, Inc. Shareholder Litigation*, 855 F. Supp. 2d 1043, 1063 (C.D. Cal. 2012) (quoting *Hardison v. Newland*, No. C984517CRB(PR), 2003 WL 23025432, at *5 (N.D. Cal. Dec. 17, 2003)). The facts offered by Plaintiffs are generally known within the territorial jurisdiction of the court and are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. To the extent they are relevant, the court will take judicial notice of these facts. The court will now address the valuation of GBP's minority-interest stock.

## II. Burden of Proof

In a suit seeking a tax refund, the taxpayers generally bear the burden of proving by a preponderance of the evidence that they are entitled to a refund of tax and what amount they should recover. *United States v. Janis*, 428 U.S. 433, 440–41 (1976). While the IRS' determination of the tax owed is presumed correct, the taxpayer may overcome this presumption by introducing "credible evidence" or "substantial evidence" establishing that the IRS' determination was incorrect. 26 U.S.C. § 7491(a)(1); *KFOX, Inc. v. United States*, 510 F.2d 1365, 1369 (Ct. Cl. 1975). "Credible evidence" is the "quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Estate of Cape v. United States*, No. 11-C-0357, 2015 WL 5794209, at *11 (E.D. Wis. Oct. 2, 2015) (citation omitted); *see also* H. Conf. Rept. 105-

599, at 240–41 (1998). If the taxpayers introduce credible evidence and establish that they have complied with the requirements to substantiate any item, maintained all records as required, and cooperated with the IRS' reasonable requests for information and documentation, the burden of proof then shifts to the Government. § 7491(a)(2).

In this case, Plaintiffs introduced credible evidence, including the testimony of two experts, to support their position, substantiated items, maintained records, and cooperated with the Government's reasonable requests. Plaintiffs were cooperative in the audit and produced the documents requested. I therefore find that Plaintiffs have successfully shifted the burden of proof to the Government. The shifting of the burden, however, is only significant in the event of an evidentiary tie. "[I]f both parties have met their burdens of production by presenting some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the initial burden of production or persuasion." *Estate of Stuller v. United States*, 55 F. Supp. 3d 1091, 1115 (C.D. Ill. 2014) (citation omitted).

## III. Analysis

### A. Valuation of Stock

A tax is imposed for "each calendar year on the transfer of property by gift during such calendar year by any individual resident." 26 U.S.C. § 2501(a)(1). The transfer of property by gift is subject to a gift tax if the value of the gift is greater than $10,000.00. §§ 2501(a)(1), 2503(b). The amount of the gift is considered to be the value of the gift on the date it was given. § 2512(a). The sole issue presented in this case is what the fair market value of the GBP stock Plaintiffs gifted to their children and grandchildren was in the tax years 2007, 2008, and 2009.

The determination of fair market value is a question of fact.  *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 452 (7th Cir. 1996).  The trier of fact "must weigh all relevant evidence of value and draw appropriate inferences."  *Estate of Adell v. Comm'r of Internal Revenue*, 108 T.C.M. (CCH) 107, 2014 WL 3819046, at *42 (2014) (citing *Comm'r v. Scottish Am. Inv. Co.*, 323 U.S. 119, 123–25 (1944)).  The fair market value of stock is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  *Frieders' Estate v. Comm'r of Internal Revenue*, 684 F.2d 224, 226 (7th Cir. 1982) (quoting Treas. Reg. § 20.2031-1(b)).  The willing buyer and seller are hypothetical.  *Eyler*, 88 F.3d at 451.  "The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage, namely the maximum profit from the sale."  *Adell*, 108 T.C.M. (CCH) 107, at *41–42 (citation omitted).

When the fair market value of stock cannot be determined by examining actual sales of stock within a reasonable time before or after the valuation date, as is the case here, the fair market value is generally determined by analyzing factors that a reasonable buyer and seller would normally consider.  These factors include

a) the nature of the business and the history of the enterprise from inception,

b) the economic outlook in general and the condition and outlook of the specific industry in particular,

c) the book value of the stock and the financial condition of the business,

d) the earnings capacity of the company,

e) the dividend-paying capacity,

f) whether the enterprise has goodwill or other intangible value,

g) sales of the stock and the size of the block to be valued, and

> h) the market price of stocks of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over the counter.

Rev. Rul. 59-60, 1959-1 C.B. 237 (1959). These factors cannot be applied with mathematical precision and must be considered in light of the facts of the particular case. *Estate of Andrews v. Comm'r of Internal Revenue*, 79 T.C. 938, 941 (1982). The fair market value of non-publicly traded stock is generally determined by using one or a combination of the following: the market approach, the income approach, or the asset-based approach. *Adell*, 108 T.C.M. (CCH) 107, at *13.

The market approach values a company's non-publicly traded stock by comparing it to comparable stock sold in arms' length transactions in the same time period. *Estate of Noble v. Comm'r of Internal Revenue*, T.C.M. (RIA) 2005-002, 2006 WL 23303, at *7 (2005). The income approach values a company's non-publicly traded stock by converting anticipated economic benefits into a single amount. Valuation methods may "directly capitalize earnings estimates or may forecast future benefits (earnings or cash flow) and discount those future benefits to the present." *Id.* The asset-based approach values a company's non-publicly traded stock by analyzing the company's assets net of its liabilities. *Id.*

**B. Expert Opinions**

Plaintiffs' experts, John Emory and Nancy Czaplinski, and the Government's expert, Francis Burns, prepared reports and provided testimony regarding the valuation of the minority-share of GBP stock on January 1, 2007; January 1, 2008; and January 1, 2009. The expert reports use different valuation methods that resulted in three proposed valuations. Those valuations, as well as the IRS' determination, are summarized below:

12

| Year | Emory | Czaplinski | Burns | IRS |
|-------|--------|------------|--------|--------|
| 2007 | $28.00 | $30.87 | $38.04 | $45.97 |
| 2008 | $25.90 | $25.92 | $27.81 | $47.63 |
| 2009 | $21.60 | $25.06 | $40.05 | $50.85 |

Plaintiffs maintain that the court should adopt the fair market value of a minority share of GBP stock as determined by Emory and as reported on their original gift tax returns: $28.00 for tax year 2007, $25.90 for tax year 2008, and $21.60 for tax year 2009. The Government has abandoned its initial valuation assessments and requests that the court adopt Burns' conclusions of fair market value: $38.40 per share for tax year 2007, $27.81 per share for tax year 2008, and $40.05 per share for tax year 2009. Burns' valuation entitled Plaintiffs to a refund of at least $1,225,092.07.

Though a court may receive opinion evidence from expert witnesses, it is not bound by the opinion of any expert witness and can accept or reject expert testimony, in whole or in part. *Estate of Newhouse v. Comm'r of Internal Revenue*, 94 T.C. 193, 217 (1990) (citing *Helverina v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938)). Because valuation necessarily involves an approximation, the figure at which the court arrives "need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence." *Estate of Heck v. Comm'r of Internal Revenue*, 83 T.C.M. (CCH) 1181, at *6 (2002) (citation omitted). "We may find evidence of valuation provided by one of the parties to be much more credible than that of the other party, so that our findings result in a significant victory for one side, rather than a compromise between the two." *Kohler v. Comm'r of Internal Revenue*, 92 T.C.M. (CCH) 48, 2006 WL 2059210, at *11 (2006) (citing *Buffalo Tool & Die Mfg. Co. v. Comm'r*, 74 T.C. 441, 452 (1980). With these considerations in mind, I will examine the experts' opinions and

methodologies.  Because the Government has the burden of proof in this case, the court will first review the conclusions of its expert, Francis Burns.

### 1. Government's Expert Witness: Francis Burns

The Government retained Burns to prepare a report regarding the valuation of the minority-share of GBP stock.  Burns is employed as a principal member of Global Economics Group to perform economic valuation work in a host of different settings.  Burns has an undergraduate degree from Stanford University and a Masters of Management (MBA) degree with an emphasis in economics and finance from Northwestern University.  He is accredited as a Senior Appraiser with the American Society of Appraisers and is an Accredited Business Appraisal Reviewer with the National Association of Certified Valuators and Analysts.  Burns has been practicing for 31 years.

In this case, Burns determined the fair market value of the gifted shares by using the market approach and the income approach and ascribing a weight to each.  In reaching his conclusions, Burns considered GBP's historical financial results, materials provided by GBP and the Government and publicly available data; attended the deposition of Joseph Baemmert, GBP's chief financial officer (CFO); and toured the converting plant and mill located in Green Bay, Wisconsin.  After analyzing the values under the market approach and the income approach, he weighted the market approach 60% and the income approach 40% to determine the final fair market value.  He chose to give more weight to the market approach because it is effective at capturing the financial conditions at the time in the marketplace and in the industry.  Burns' calculations resulted in a fair market value of GBP common minority stock of $38.40 per share for tax year 2007, $27.81 per share for tax year 2008, and $40.05 per share for tax year 2009.

14

Under the market approach, Burns identified 19 to 20 companies that were in the same business as GBP. He eliminated companies based on dissimilar characteristics and identified four comparable companies for each year. He completed a financial ratio analysis by comparing GBP to the guideline companies and found that the two most comparable companies were PAC and Rock-Tenn. From there, Burns derived a set of multiples by looking at enterprise value to earnings before interest, tax, depreciation, and amortization (EBITDA) and price to earnings and applied the multiples to the relevant GBP financial data. Burns applied an S-corporation tax premium to account for GBP's tax advantages as an S-corporation. He also added back the non-operating assets to reach an indicated value of GBP common stock. Burns did not adjust his methodology to take into account the 2008 recession because GBP was in good financial condition as compared with its creditors. He testified that he simply followed the numbers where they led him.

Under the income approach, Burns completed a capitalized cash flow analysis, rather than a discounted cash flow analysis, because GBP did not prepare any long-term forecasts and he would be required to speculate under that method. Burns determined a normalized net sales level and deducted the cost of goods sold and administrative expenses from the normalized net sales level to determine the income from operations. He applied an effective tax rate to GBP as if it were a C-corporation and then applied an adjustment to reflect the value of GBP as an S-corporation. He also decided to reduce GBP's value by $5.8 million per year based on GBP's capital expenditures. Burns determined GBP's potential growth rate and applied a perpetuity growth rate of 4.9% each year. He then added back the S-corporation premium to account for the tax advantages associated with S-corporation status and the non-operating assets, which he valued separately.

15

Once Burns calculated the preliminary minority share value, he then applied marketability discounts of 10.8% for tax year 2007, 11.0% for tax year 2008, and 11.2% for tax year 2009. He determined the discount by considering restricted stock studies, the costs of going public, and the overall academic research on the topic. He applied the marketability discounts to reach his conclusions of fair market value.

After carefully reviewing and considering the evidence, the court finds that Burns' valuation conclusions overstate the value of a minority-held share of GBP stock. As an initial matter, Burns' valuation under the market approach in his 2009 analysis is inflated because he did not adequately account for the 2008 recession and relied on an outlier as a comparable company. As noted above, the "economic outlook in general" is one of the factors to be considered in deciding fair market value of stock where actual stock sales are not available. Rev. Rul. 59-60, sec. 4.01(b). In addition to the facts of which the court has taken judicial notice, Plaintiffs offered evidence through the testimony of GBP's CFO Joseph Baemmert that the recession at the end of 2008 created significant uncertainty as to GBP's financial situation. Baemmert testified that December of 2008 saw the "lowest operating rates in the paper industry mill operations that I've ever seen in my career. Pretty much everything came to a halt." ECF No. 39 at 25. Baemmert also noted that the largest box producer and corrugated board producer in the country went bankrupt during that period. *Id.* Burns entirely disregarded this factor in his 2009 analysis, notwithstanding the admonition that "[a] sound appraisal of a closely held stock must consider current and prospective economic conditions as of the date of appraisal, both in the national economy and in the industry or industries with which the corporation is allied." Rev. Rul. 59-60, § 4.02(b).

Another factor to be considered in determining the value of privately-held stock is "the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange." 26 C.F.R. § 20.2031–2(f); *see also Heck v. Comm'r of Internal Revenue*, 83 T.C.M. (CCH) 1181, 2002 WL 180879, at *6 (2002). Burns considered four comparable companies in valuing the stock for each tax year but only used two comparable companies—Rock-Tenn and Packaging Corporation of America (PCA)—to derive his market multiples for each year. Although the parties agree that each expert identified Rock-Tenn as an appropriate comparable company for tax years 2007 and 2008, that company was an outlier in the marketplace for tax year 2009 because, while the stock prices of other guideline companies dropped by approximately 34%, Rock-Tenn's stock price increased 35% due to its acquisition of another company. In other words, although GBP had a strong earnings progression for the first part of 2008, the circumstances surrounding Rock-Tenn's strong earnings progression were vastly different than the circumstances GBP experienced. Burns' use of Rock-Tenn as a comparable company for the tax year 2009 also skewed the fair market value of a minority share of GBP stock.

Burns' approach was to simply follow the numbers where they led him. But the determination of value "of closely held stock is a matter of judgment, rather than mathematics." *See Estate of Ford v. Comm'r*, 1993 Tax Ct. Memo LEXIS 595, T.C. Memo 1993-520, at *11, 23 (U.S. Tax Ct. 1993). Mathematical calculations may give an appearance of precision even when the mechanical formulae on which they rest depends on assigning arbitrary weights to factors that in truth are matters of prudential judgment. Burns' attempt to maintain consistency throughout each tax year by applying multiples derived from Rock-Tenn's financial performance, despite the fact

17

that Rock-Tenn was not an appropriate comparable for each year, led Burns to adhere to an approach that did not adequately account for the effect of the economic recession.

Moreover, Burns did not properly value the non-operating assets: Hanging Valley Investments LLC, the group life insurance policies, and the two GBP private airplanes. In his assessment, Burns separated the non-operating assets out of GBP's operating financials, valued the non-operating assets independently, and added the values back to the business' operating value. Burns accounted for the assets at almost their full value, with a slight discount attributed to Hanging Valley for minority shareholders. Yet, the valuation method of adding back the full value of non-operating assets is more properly employed when an entire business, rather than a minority stock interest, is being valued. The Government contends that a hypothetical seller would never ignore the asset value of the non-operating asset when selling his minority share. But a minority share holder has no control over the use or dissipation of the assets and cannot realize the value of the assets until GBP is sold. Because there is no expectation of liquidation, Burns' treatment of the non-operating assets overstated the value of the stock for each year in question.

Burns' marketability discounts were significantly below those of the other expert witnesses. A discount for lack of marketability is a relative adjustment designed to account for the difference in value between privately-held stocks and publicly-traded stocks. While the parties agree that Plaintiffs are entitled to a reduction in value for GBP's shares' lack of marketability, they disagree as to the appropriate percentage discounts. In this case, Burns assessed marketability discounts of 10.8%, 11.0%, and 11.2% for the respective tax years at issue. These reductions are even less than the discounts the same expert appears to have arrived at in valuing shares of a limited partnership that was little more than a holding company for stock in *Holman v. C.I.R.*, 601 F.3d 763, 774 (8th

Cir. 2010). Given the far greater liquidity of the stocks held by the limited partnership in *Holman*, the discounts assessed by Burns in this case seem unreasonably low.

Before a discount for lack of marketability is applied to the respective values assessed by the experts, the fair market values are relatively consistent. After the discount for lack of marketability was applied, however, Burns' values were significantly higher than those of Emory and Czaplinski, and considerably so for tax year 2009. The court finds that Burns' discounts for lack of marketability are too low. In determining the discounts for lack of marketability, Burns considered the cost of an initial public offering (IPO), even though he did not expect GBP to go public. The Government contends that GBP is of a size and wherewithal such that it could become a publicly-traded company and that the only hurdle between GBP's current share price and fully-marketable public shares is the cost associated with going public. But GBP should not be penalized for its owners' decision to remain privately-held in order to protect its values in serving its employees, its family, and its community. Burns' analysis was also conducted with the benefit of hindsight and did not account for the reality of the difficulty of disposing of the stock of a relatively small company, in a capital intensive, mature, competitive business with no public interest. In short, Burns' reliance on the cost of an IPO resulted in the application of an incorrect discount for lack of marketability.

Finally, the court notes Plaintiffs' argument that Burns applied a separate subchapter S premium to his valuation. Both Emory and Burns applied C-corporation level taxes to GBP's earnings to effectively compare GBP to the other C-corporations. Burns then assessed a premium to account for the tax advantages associated with subchapter S status, such as the elimination of a level of taxes, and noted GBP did not pay C-corporation taxes in any of the valuation years and did

19

not expect to pay those taxes in the future. Emory and Czaplinski did not consider GBP's subchapter S status to be a benefit that would add value to a minority shareholder's stock because a minority shareholder cannot change GBP's corporation status. The court finds GBP's subchapter S status is a neutral consideration with respect to the valuation of its stock. Notwithstanding the tax advantages associated with subchapter S status, there are also noted disadvantages, including the limited ability to reinvest in the company and the limited access to credit markets. It is therefore unclear if a minority shareholder enjoys those benefits.

In any event, given Burns' failure to consider appropriate comparable companies under the market approach and the impact of the economic recession, his improper treatment of the non-operating assets, and his application of a low discount for lack of marketability, the court concludes that Burns overvalued a minority share of GBP stock for the tax years 2007, 2008, and 2009. The court gives less weight to Burns' conclusions as a result.

### 2. Plaintiffs' Expert Witnesses: John Emory and Nancy Czaplinski

The court will now briefly describe the valuation conclusions of Plaintiffs' experts, John Emory and Nancy Czaplinski. Emory has prepared valuation reports for GBP since 1999 and prepared the valuation of the stock that was submitted with Plaintiffs' tax returns. Emory worked at Robert W. Baird and Company, where he was responsible for appraisal services, for approximately 31 years before co-founding Emory & Co. LLC in 1999. He has been a Senior Member of the American Society of Appraisers since 1985 and has been named examiner of the year by the society on three separate occasions.

Emory calculated the fair market value of the GBP stock to be $28.00 per share for tax year 2007; $25.90 per share for tax year 2008; and $21.60 per share for tax year 2009. Each year Emory

performed the annual GBP stock valuation, he employed the market approach. Although Emory did not explicitly complete an income approach assessment, he incorporated concepts of the income approach into his overall analysis. Emory testified that the market approach is the better methodology here because there is a sufficient number of comparable companies for each tax year. In applying the market approach, Emory reviewed his prior GBP valuation reports, GBP's audited consolidated financial statement for the previous five years, and GBP's financial estimates for the upcoming year. He also met with GBP management to discuss the company's state of affairs, its financial statements, and any unique circumstances GBP faced or expected to experience.

After reviewing this information, Emory selected comparable guideline companies to determine the base value a minority share of GBP stock might be worth if it were sold at a mature public market. Accounting for GBP's industry, its conservative management style, its entire book value, and other considerations, Emory compared GBP to companies on a "holistic" basis. Emory used five to six comparable companies in each year at issue. In 2007, PCA, Temple-Inland, Inc., Rock-Tenn Company, Smurfit-Stone Container Corporation, and Longview Fibre Company were the comparable companies. In 2008, PCA, Temple-Inland, Rock-Tenn, Smurfit-Stone, and International Paper were the comparables. And in 2009, PCA, Temple-Inland, Rock-Tenn, Greif Inc., International Paper, and Avery Dennison Corporation were the comparable companies. After selecting the guideline companies, Emory derived multiples via the ratio of market value of invested capital to EBITDA, to account for GBP's subchapter S status, as well as multiples derived from earnings, dividends, sales, assets, and book value. He also evaluated price-to-earnings, price-to-EBITDA, and price-to-sales multiples. Emory then compared GBP's multiples to each guideline company's multiples to reach a base value for the stock.

In addition to comparable companies, Emory considered the non-operating assets to the extent that those assets contributed to GBP's overall earnings. He did not add their overall value back into the value of the minority shares, reasoning that a minority shareholder cannot realize the value of those assets, and only considered them in conjunction with GBP's book value. He also accounted for the 2008 recession in determining the stock's fair market value as of December 31, 2008. In his December 31, 2008 analysis, Emory considered Rock-Tenn to be an outlier, even though its comparability to GBP improved in 2008, because it was not mirroring the market for equities, as its stock price increased and it had a strong earnings progression for 2008. Emory assumed base values of $40 per share as of December 31, 2006; $37 per share as of December 31, 2007; and $30 per share as of December 31, 2008.

To his base values, Emory applied a discount for lack of marketability to reflect the illiquidity of the minority shares of GBP stock. In applying the discounts, Emory considered restricted stock studies, which evaluate identical stock and determine the discount for an individual buying a share that she could not sell for some period of time. He also consulted pre-IPO studies because those studies compare the price of stock that is sold in advance of an initial public offering to the price of the stock at the time of the initial public offering. In reaching these discounts, Emory considered the financial position of GBP, the payment of dividends, the company's management, the possibility of any future public offering, and GBP's status as an S-corporation but did not quantify the impact any of these factors had on his conclusions. While Emory also considered the Bylaw's Family Restriction when applying discounts for lack of marketability, he noted that the restriction did not have a significant impact on the discounts. Emory applied a 30% discount for

tax years 2007 and 2008 and a 28% discount in tax year 2009. Emory's marketability discounts were the highest of the three experts but are lower than discounts he had applied in the past.

In response to the IRS' criticism that Emory did not employ a separate income approach, Plaintiffs retained Czaplinski to prepare a report regarding the valuation of the minority-share of GBP stock using a combination of the market approach and the income approach. Czaplinski is a Certified Public Accountant and the Managing Director in the Valuation Advisory Services Group of Duff & Phelps LLC. She has been in the business valuation profession for 29 years and is a member of the American Society of Appraisers, where she previously served as a chapter President and currently serves as a member of the Business Valuation Committee.

Czaplinski calculated the fair market value of the stock to be $30.87 per share for tax year 2007; $25.92 per share for tax year 2008; and $25.06 per share for tax year 2009. She weighted the market approach 14% and the income approach 86%. As to the market approach, Czaplinski searched for comparable companies and compared those companies to GBP in terms of growth, profitability, and geographic distribution. She compared GBP to PCA, International Paper, Grief, Rock-Tenn, Smurfit-Stone, and Temple-Inland in 2007; to PCA, International Paper, Grief, Rock-Tenn, and Smurfit-Stone in 2008; and PCA, International Paper, Greif, and Temple-Inland in 2009. She noted a perfectly comparable company does not exist because all potentially comparable companies are larger and more geographically diverse than GBP. Czaplinski selected price-to-pre-tax-income as her multiple and used pre-tax income to capture the minority interest of the stock at issue, to capture the value of the non-operating assets, and to reflect GBP's subchapter S status. Because GBP had lower revenue and fewer assets than the comparable companies, Czaplinski selected the lowest multiple for each year in question.

Under the income approach, Czaplinski used the capitalized economic income method and the discount dividend method and applied three sensitivities within each method, resulting in six valuations. Czaplinki accounted for the value of the non-operating assets under both approaches by including the income for Hanging Valley and the cash value of the life insurance policies, and accounted for the family's personal use of the airplanes by adding back 50% of their operating costs. She also accounted for GBP's subchapter S status under both methods. Under the capitalized economic income method, Czaplinski adjusted the discount rate in the base cost to reflect an equivalent after-corporate and after-personal tax return. Under the discount dividend method, she used a tax rate based on three- and five-year averages and on the prior year effective date. When determining the value of the stock on December 31, 2008, she applied a company-specific risk factor to the income approach calculations to account for the 2008 recession.

Czaplinski's market approach and income approach yield an as-if-freely-traded minority equitable interest. She averaged the seven values she calculated under the market approach and the various income method approaches to obtain an aggregate, as-if-freely-traded minority common equity value. She divided this amount by the total number of outstanding GBP shares to calculate the per-share value and applied a 20% discount for lack of marketability each year. In determining the discount for lack of marketability, Czaplinski considered company and industry characteristics, including the applicable stock restrictions and GBP's S-corporation status. She concluded neither the stock restrictions nor the S-corporation status affected the marketability discount.

After reviewing the reports and testimony of these witnesses, the court finds the valuation methodology of Emory is the most sound. Emory is a certified appraiser who spent ample time with the company and management and truly understands GBP's business. As a result of this

understanding, he used more accurate projections to value the business and more adequately accounted for the effects of the economic recession. Although the Government criticizes Emory for not formally employing the income approach in valuing the stock, all of the experts agreed that the market approach captures real world investors' decisions on the valuation dates. The Government asserts that Emory cherry-picked comparable companies to find the lowest multiples and that Emory's approach was results oriented, but the record shows that Emory derived base values through the exercise of interviewing GBP management, reviewing his prior-year reports, and analyzing the guideline companies and the multiples they yielded. He further examined attributes that were specific to GBP, analyzed GBP's debt and management philosophy, and reviewed business metrics including price, book value, earnings, dividends, EBITDA, assets, and sales on a "holistic" basis to determine a value that best fit the guideline companies. His analysis recognizes the variability and non-quantifiable judgments by which various factors are taken into consideration and impact the price of a share of minority stock. Emory did not create his valuations with the benefit of hindsight, for the purpose of litigation, or for Plaintiffs' benefit in transferring their stock to their children and grandchildren. He provided credible and thorough valuations supporting the value of the stock Plaintiffs reported on their tax returns.

### C. Family Transfer Restriction

The Government asserts that Plaintiffs' experts both erred in considering the Family Transfer Restriction contained in GBP's Bylaws to calculate the discount for lack of marketability. Plaintiffs maintain that the Restriction should be considered when determining the value of their shares because its limitation on the shareholders' ability to transfer shares lowers their value. Generally, the valuation of any stock shall be determined without considering restrictions to sell the

stock. 26 U.S.C. § 2703(a). However, any restriction that (1) is a "bona fide business arrangement;" (2) is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth; and (3) includes terms that are comparable to similar arrangements entered into by persons in an arms' length transaction shall be considered when valuing such property. § 2703(b)(1)–(3).

Plaintiffs maintain that the Restriction satisfies all three requirements. With regard to the first requirement, Plaintiffs assert that the Restriction is a bona fide business arrangement. While the term "bona fide business arrangement" is defined in neither the Internal Revenue Code nor the regulations, courts have recognized that the maintenance of family ownership and control of a business may be a bona fide business purpose. *See Estate of Gloeckner v. Comm'r*, 152 F.3d 208, 214 (2d Cir. 1998); *St. Louis Cty. Bank v. United States*, 674 F.2d 1207, 1210 (8th Cir. 1982); *Estate of Lauder v. Comm'r*, 64 TCM 1643, 1660 (1992).

In *Holman v. Commissioner of Internal Revenue*, the court upheld the decision of the Tax Court to disregard a similar restriction in shares of a limited partnership that was essentially a holding company for stock. 601 F.3d 763 (8th Cir. 2010). In affirming the Tax Court's finding that the restriction was not a bona fide business arrangement, the court explained:

> Simply put, in the present case, there was and is no "business," active or otherwise. The donors have not presented any argument or asserted any facts to distinguish their situation from the use of a similar partnership structure to hold a passbook savings account, an interest-bearing checking account, government bonds, or cash. We and other courts have held that "maintenance of family ownership and control of [a] business" may be a bona fide business purpose. *St. Louis County Bank*, 674 F.2d at 1207; *see also Estate of Bischoff v. Comm'r*, 69 T.C. 32, 39–40, 1977 WL 3667 (1977). We have not so held, however, in the absence of a business.

*Id.* at 770.

GBP, in contrast, is unmistakably an operating business. GBP is a family-owned S-corporation, and there is no dispute that the Family Transfer Restriction was incorporated into GBP's Bylaws to ensure that the Kress family retains control of the company, to minimize the risk of disruption by a dissident shareholder, to ensure confidentiality of GBP's affairs, and to ensure that all sales of GBP minority stock are to qualified subchapter S shareholders. The Government argues that the Restriction does not constitute a bona fide business arrangement because it does not prevent a dissident Kress family shareholder from causing management discontinuity by failing to maintain confidentiality or by starting a competing business. But the fact that the objectives of the Restriction are not fail-proof does not mean that the Restriction is not a bona fide business arrangement. The family transfer restriction significantly reduces the risk of these things occurring.

To be sure, family transfer restrictions in a company's stock may not be a way to maximize shareholder value. But they are consistent with the goals of maintaining a family business and ensuring that the business continues to provide an opportunity for family members to make a living while at the same time continuing to serve the interests of its employees and the community. These are also bona fide interests of business leaders even though not purely economic. For all of these reasons, the court finds that the family transfer restrictions satisfy the first requirement of § 2703(b).

Under the second requirement, the Restriction cannot be "a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth." § 2703(b)(2). Citing Treasury Regulation § 25.2703–1, the Government contends that this second requirement applies not only to transfers at death but also to *inter vivos* transfers. *See* 26 C.F.R. § 25.2703–1(b)(1)(ii) ("The right or restriction is not a device to transfer property to the natural objects of the transferor's bounty for less than full and adequate consideration in money

or money's worth."). The Government argues that the term "decedent" in § 2703(b)(2) is ambiguous in light of the statute's place within Subtitle B, Chapter 14 of the Internal Revenue Code, which includes other valuation rules targeting transfer avoidance schemes, and thus the court should defer to the agency's interpretation of the statute.

In reviewing an agency's interpretation of a statute, the court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council Inc.*, 467 U.S. 837, 842 (1984). If so, the court must give effect to the statute's unambiguous language and end the inquiry, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, Congress was silent or ambiguous, the agency's interpretation of the statute must be upheld if it is based on a permissible or reasonable construction of the statute. *Id.* at 843.

Although Chapter 14 is intended to generally address transfer tax avoidance schemes, it is clear from the statute itself that the phrase "members of the decedent's family" unambiguously limits its application to transfers at death. *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "decedent" as a "dead person, especially one who has died recently"); *see also Smith v. United States*, No. C.A. 02-264 ERIE, 2004 WL 1879212, at *6 (W.D. Pa. June 30, 2004) (noting that "one of Congress's primary concerns [in enacting § 2703(b)(2)] was the free passage of wealth to family members through a device that is testamentary in nature"). Although Congress has attempted to amend § 2703(b)(2) to conform with the agency regulations, no such legislation has been enacted. *See Smith*, 2004 WL 1879212, at *6 n.3 (citing HR Conf. Rep. 1555, 102d Cong., 1st Sess. (1991); The Revenue Bill of 1992, HR Conf. Rep. 11, 102d Cong., 2d Sess. (1992)); *see also Holman*, 601 F.3d at 781 (Bean, J., dissenting) ("I find it telling that members of Congress have failed in their

attempts to amend § 2703(b)(2) by substituting the legislative phrase 'members of the decedent's family' with the Commissioner's phrase 'natural objects of the transferor's bounty.'").

In short, I find that Congress has spoken unambiguously to the precise question at issue: § 2703(b)(2) applies specifically to transfers at death. Because Plaintiffs gifted their shares to their family members as living persons, they are, by definition, not decedents. Therefore, § 2703(b)(2) is satisfied. But even were I to conclude that § 2703(b)(2) does apply to *inter vivos* transfers, this would not change the result. For as noted above, the family transfer restrictions serve the bona fide purpose of maintaining family ownership and control of the business, and were not intended as a tax avoidance device.

Finally, the third requirement is that the Restriction be comparable to similar arrangements entered into by persons in an arms' length negotiation. § 2703(b)(3). The Treasury Regulations provide that Plaintiffs must submit specific evidence showing that the "right or restriction is treated as comparable to similar arrangements entered into by persons in an arm's length transaction if the right or restriction is one that could have been obtained in a fair bargain among unrelated parties in the same business dealing with each other at arm's length." 26 C.F.R. § 25.2703–1(b)(4)(i). Though Plaintiffs contend restrictions like the Kress Family Restriction are common in the commercial world, they have not produced any evidence that unrelated parties dealing at arms' length would agree to such an arrangement. For this reason, the Kress Family Restriction does not satisfy the requirement set forth in § 2703(b)(3), and it was improper for Emory to consider the Restriction in determining the discount for lack of marketability.

### D.  Court's Valuation

This does not alter the court's conclusion that Emory's opinion as to the valuation of GBP's stock on the relevant dates was more persuasive than Burns'.  Emory testified that he gave the restriction minimal consideration in assessing the discount for lack of marketability, and for the reasons set forth above, the court is satisfied that Burns' analysis, and in particular his reduction for lack of marketability and failure to take into consideration the minority interest in evaluating the non-operating assets and the stock as a whole, resulted in a significantly higher estimate of the value of the stock's fair market value.

The court therefore finds that the Government failed to prove by a preponderance of the evidence that Burns' determination of the fair market value of GBP's common minority stock is correct.  In contrast, Emory provided reliable valuations of the GBP minority-owned shares of stock.  Rather than accept Emory's discount for lack of marketability assessments, however, the court holds that a 27% discount for lack of marketability for tax years 2007 and 2008 and a 25% discount for lack of marketability for tax year 2009 are more fitting.  Although the Kress Family Restriction was only given minimal consideration in Emory's analysis, any consideration of the Restriction was improper.  The three-percent downward adjustment in discounts for lack of marketability, which does not take the Restriction into account, is therefore appropriate.  Accordingly, the court concludes that the fair market value of the stock is as follows: $29.20 for tax year 2007, $27.01 for tax year 2008, and $22.50 for tax year 2009.

### CONCLUSION

For the foregoing reasons, the court concludes that the fair market value of the stock is $29.20 per share for tax year 2007, $27.01 per share for tax year 2008, and $22.50 per share for tax

year 2009.  The Government's objection to the admission of Plaintiffs' proposed exhibits 2, 3, 4, and 27 is **SUSTAINED**.  Plaintiffs' motion for judicial notice of administrative facts (ECF No. 54) is **GRANTED**.  The parties must submit a proposed judgment within 30 days of the date of this order in accordance with this decision.

     **SO ORDERED** this  _25th_  day of March, 2019.

                              s/ William C. Griesbach
                              William C. Griesbach, Chief Judge
                              United States District Court